# UNITED STATES DISTRICT COURT

for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the*<br>*person by name and address)*<br><br>18409 Orange Street, Hesperia, California 92345<br>("SUBJECT PREMISES") | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AMENDED to reflect corrected address**

Case No. 2:19-MJ-04977

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), 846 | Possession with Intent to Distribute a Controlled<br>Substance and Conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Rosemary Ramirez, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, CA

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: Billy Joe McLain x 6702

## **ATTACHMENT A-1**

<u>PREMISES TO BE SEARCHED</u>

The premises located at 18409 Orange Street, Hesperia, California 92345 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is further described as a ranch-style house depicted below with an orange stucco roof and white wood trim, which is enclosed behind a gate made of rod iron and brick.  The SUBJECT PREMISES includes any garage, attic or crawl space, any backyard (as well as sheds or storage space), and vehicles on the SUBJECT PREMISES.



**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

      e.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

      f.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      g.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

      h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

      i.   Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs;

      j.   Contents of any calendar or date book;

      k.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

      l.   Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offense/s, and forensic copies thereof.

      m.   With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

      i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

    v.   evidence of the times the device was used;

    vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

    vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

    viii.    records of or information about
Internet Protocol addresses used by the device;

    ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

  2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

        b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

        i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent contraband or evidence of a crime.

    d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

    e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

    g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

    h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices

pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Rosemary Ramirez, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.     This affidavit is made in support of an application for a warrant to search 18409 Orange Street, Hesperia, California 92345 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and a white Nissan Sentra with CA license plate number 7EVM912 (the "SUBJECT VEHICLE") as described more fully in Attachment A-2.

2.     The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am a Special Agent for the Drug Enforcement Administration ("DEA"), assigned to the Fresno District Office, and have been so employed since November 2003.  During this time, I have completed a 16-week training Academy at Quantico, Virginia, as well as several other DEA schools.  This training included the investigation of violations of Title 21, United States Code, Sections 841(a)(1) and 846.  In addition, I have received special training in the methods used by drug traffickers to illegally produce methamphetamine and cocaine. I am familiar with, and have participated in, formal methods of investigations, including electronic surveillance, visual surveillance, questioning of witnesses, search warrants, working with confidential informants, pen registers, trap and trace, and the use of undercover agents.  I have participated in investigations involving organizations trafficking in controlled substances.  Based on my experience and the training I have acquired from drug enforcement schools and from working with other Special Agents and Detectives, I am providing the following facts.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    In October 2019, law enforcement intercepted wire communications, pursuant to a federal wiretap, during which Carlos Lopez ("LOPEZ"), a drug trafficker, discussed delivering drugs via courier to Monica Gutierrez ("GUTIERREZ") in Mendota, California, so that GUTIERREZ could then deliver those drugs to a third person.

6.     On October 14, 2019, agents conducting surveillance saw Julio Cesar Moreno Garcia ("MORENO") arrive in the SUBJECT VEHICLE and meet GUTIERREZ outside of 1782 9th Street, Mendota, California 93640 ("GUTIERREZ's Residence").  Agents saw MORENO enter GUTIERREZ's Residence carrying a full duffle bag.  Minutes later, agents saw MORENO return to the SUBJECT VEHICLE with an empty duffle bag; then agents saw both MORENO and GUTIERREZ separately drive away.  A sheriff's deputy stopped GUTIERREZ and found two kilograms of cocaine in her vehicle.

7.     Around that same time, a sheriff's deputy stopped MORENO, and MORENO said he lived at the SUBJECT PREMISES.  On October 30, 31, and November 1, agents conducted surveillance of the SUBJECT PREMISES and saw the SUBJECT VEHICLE parked in the front driveway.  The SUBJECT VEHICLE is registered to MORENO at the SUBJECT PREMISES.  A United States Magistrate Judge in the Eastern District of California has authorized a criminal complaint and warrant for MORENO's arrest for a violation of 21 U.S.C. § 841(a)(1): distribution and possession with intent to distribute a controlled substance.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.     Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

9.     On September 19, 2019, the Honorable Lawrence J. O'Neill, Chief United States District Court Judge for the Eastern District of California, signed Wire Intercept Order 1:19-SW-00303-LJO authorizing the interception of wire and

electronic communications for 559-835-7889 ("Target Telephone 22"), believed to be used by LOPEZ.

###    A.    Drug Traffickers are Intercepted on a Wire Discussing a Drug Delivery.

10.  On October 13, 2019, agents intercepted a call during which LOPEZ, using Target Telephone 22, discussed with LOPEZ's suspected drug supplier ("Person 1"), in coded language, a drug transaction by which Person 1 would arrange for a courier to deliver a suspected drug load to a woman in Mendota, California on LOPEZ's behalf.  During the call, Person 1 indicated his "guy" would deliver the suspected drug load.

11.  That same day, Target Telephone 22 (believed be used by LOPEZ), exchanged text messages with the number 559-776-5820, which is subscribed to GUTIERREZ at GUTIERREZ's Residence, and believed to be used by GUTIERREZ.  During the text message exchange, LOPEZ told GUTIERREZ that "Tomorrow they will go see you, so you can go to the dealer."  After GUTIERREZ expressed some confusion, LOPEZ clarified, "I'm not over there. They're gonna take them over there to you."  GUTIERREZ responded, "Oh, now I understand. Okay, thank you."

12.  Based on my training, experience, and knowledge of this investigation, I believe LOPEZ was telling GUTIERREZ that she would receive an incoming drug shipment from someone and then GUTIERREZ was going to deliver those drugs "to the dealer."

**B.   MORENO, Who Lives at the SUBJECT PREMISES, Delivers Cocaine While Driving the SUBJECT VEHICLE.**

13.   On the morning of October 14, 2019, agents set up surveillance at GUTIERREZ's Residence in anticipation of GUTIERREZ receiving a drug shipment.

14.   At about 9:01 AM, agents saw the SUBJECT VEHICLE arrive at GUTIERREZ's Residence.  A DMV check revealed that the SUBJECT VEHICLE is registered to MORENO at the SUBJECT PREMISES.

15.   Agents saw a male (later identified as MORENO) exit the SUBJECT VEHICLE and meet a woman (later identified as GUTIERREZ) outside of GUTIERREZ's Residence.  Agents then saw MORENO take a duffle bag, which appeared to be full, from the SUBJECT VEHICLE and enter GUTIERREZ's Residence along with GUTIERREZ.  Minutes later, agents saw MORENO leave GUTIERREZ's Residence with the duffle bag, which appeared to be empty; MORENO threw the duffle bag into the back of the SUBJECT VEHICLE and drove away.

16.   Based on the above information, and my investigation of this case, I believe that the drug shipment LOPEZ was intercepted discussing with Person 1, and texting GUTIERREZ about, on October 13, was in the duffle bag that MORENO delivered to GUTIERREZ.

17.   Later that morning, agents saw GUTIERREZ drive away from GUTIERREZ's Residence.  She was stopped by a Fresno County Sheriff's Office K9 patrol.  Following a positive alert by the drug detection dog, deputies searched GUTIERREZ's vehicle and

found about two kilograms that field-tested positive for
cocaine.  GUTIERREZ was arrested on state drug charges.

**C.    MORENO Confirms He Lives at the SUBJECT PREMISES and that the SUBJECT VEHICLE Belongs to Him.**

18.   At about 10:33 a.m., MORENO was stopped by a Deputy
Daulton of the Kings County Sheriff's Office for speeding.
During the traffic stop, MORENO provided two Mexico
identification cards.  The first was a Mexico Consular
identification card, which listed MORENO's name as Julio Cesar
MORENO Garcia and address as the SUBJECT PREMISES.  The second
identification card was a Mexican driver's license, also in the
name of Julio Cesar MORENO Garcia, which listed an address in
Sinaloa, Mexico.  Both identification cards contained
photographs of MORENO, whom Deputy Daulton recognized as the
driver and sole occupant of the SUBJECT VEHICLE.  During the
stop, MORENO stated that he resides at the SUBJECT PREMISES,
which is the registered address for the SUBJECT VEHICLE.  MORENO
was released.

19.   On October 30 and 31, and November 1, 2019, agents
conducted surveillance at the SUBJECT PREMISES, and, on each of
those days, saw the SUBJECT VEHICLE parked in the gated front
driveway of the SUBJECT PREMISES.

20.   On November 7, 2019, the Honorable Shiela K. Oberto,
United States Magistrate Judge for the Eastern District of
California signed a criminal complaint (1:19-MJ-00211-SKO)
authorizing the arrest of MORENO for violating 21 U.S.C.
§ 841(a)(1): distribution and possession with intent to

distribute a controlled substance and aiding and abetting.
MORENO has not yet been arrested.

21.   Based on the above information, I believe MORENO is a
drug trafficker whose primary residence is the SUBJECT PREMISES
and who uses the SUBJECT VEHICLE to traffic drugs.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

22.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences.

c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,

sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

      d.   Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices and in their residence.  Drug traffickers
often keep records of meetings with associates, customers, and
suppliers on their digital devices and in their residence,
including in the form of calendar entries and location data.

      e.   Drug traffickers often use vehicles to transport
their narcotics and may keep stashes of narcotics in their
vehicles in the event of an unexpected opportunity to sell
narcotics arises.

      f.   Drug traffickers often maintain on hand large
amounts of United States currency in order to maintain and
finance their ongoing drug trafficking businesses, which operate
on a cash basis.  Such currency is often stored in their
residences and vehicles.

      g.   Drug traffickers often keep drugs in places where
they have ready access and control, such as at their residence
or in safes.  They also often keep other items related to their

drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

23.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VII. <u>CONCLUSION</u>

25.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1 and the SUBJECT VEHICLE described in Attachment A-2.


                                                 _____
                                                 Rosemary Ramirez, Special
                                                 Agent DEA

Subscribed to and sworn before me
this \_\_\_\_\_ day of November 2019.


_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE